IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  | : |  |
|---|---|---|
| BRENDA P. MILES | : |  |
|  | : |  |
| v. | : | Civil Action No. DKC 2009-0503 |
|  | : |  |
| GREGORY B. JACZKO[1] | : |  |
|  | : |  |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this
employment discrimination action is a motion to dismiss and for
summary judgment filed by Defendant Gregory B. Jaczko (Paper
29). The issues are fully briefed and the court now rules
pursuant to Local Rule 105.6, no hearing being deemed necessary.
For the reasons that follow, Defendant's motion will be granted.

**I.    Background**

**A.    Plaintiff's Employment History with the Nuclear
Regulatory Commission**

Plaintiff Brenda P. Miles, an African-American woman, began
working as a Secretary in the Commission Support Unit ("CSU") at
the U.S. Nuclear Regulatory Commission ("NRC") in 1986. (Paper

---

[1] Pursuant to Fed.R.Civ.P. 25(d), the current Chairman of
the Nuclear Regulatory Commission is substituted for the former
chair.

33, Attachment 1).[2]   The CSU provides administrative support as-needed to Commissioners' offices through the use of "floating" secretaries.  (*Id.*).

Plaintiff's troubles at the NRC began in late 2006, when she started having physical ailments.  Plaintiff alleges that on December 11, 2006 she submitted a "reasonable accommodation request" to Jim McDermott, Director of Human Resources ("McDermott").  The request was attached to a note that said "pt requires a CTS friendly work station, new mouse, keyboard, computer stand, desk and appropriate chair, and writ band []."  (Paper 29, at 4; Ex. 2 at 104).[3]  McDermott did not reply to the letter and has stated that he did not recall receiving the documents.  Plaintiff never contacted McDermott further.

On February 8, 2007, Plaintiff provided a new doctor's note (dated February 2, 2007) to her immediate supervisor, Martha Lopez-Nagle ("Lopez-Nagle").  (Paper 29, at 4).  That same day, she also filed a complaint with the equal employment office

---

[2] The affidavit prepared and submitted by Plaintiff as part of her Response in opposition does not meet the requirements set out in Fed.R.Civ.P. 56(e).  Because it is unsigned, the affidavit cannot be considered either "sworn or certified."

[3] Because not all exhibits are listed as attachments in CMF/ECF, the appropriate exhibit number will be used to identify the referenced document.

("EEO") of the NRC, alleging that her supervisor was refusing to accommodate her disability.  (Paper 1 ¶ 4).

On February 9, 2007, Lopez-Nagle met with Plaintiff to discuss the request for accommodation.  (Paper 29 at 5).  Lopez-Nagle approved the change to Plaintiff's work schedule that Plaintiff requested, and referred her to the Assistance Program Manager.  He referred her to Eleni Davis, a contractor responsible for conducting ergonomic assessments.  (*Id.*).  Eleni Davis told Plaintiff that because she had no permanent work station it would be impossible to do an ergonomic assessment. Plaintiff had no permanent work station because she was a floater.  Twelve different workstations existed that she could be assigned to work at on any given day.  (*Id.*).  In order to accommodate Plaintiff's specific requests, twelve different workstations would need to have been reconfigured.  As an alternate accommodation, McDermott offered to reassign Plaintiff so that she would have a permanent work station.  Plaintiff declined.  (Paper 29, at 5; Ex. 6 ¶ 11).

From February 2007 to July 2007, Lopez-Nagle assigned Plaintiff to close down the office of Commissioner Edward McGaffigan.  (Paper 29, Ex. 4 ¶ 24).  Lopez-Nagle asked Plaintiff to do this rotation to help alleviate some of her pain, because she would not have to type as much.  (*Id.*).

3

On May 18, 2007, Lopez-Nagle spoke with Plaintiff about the Computer/Electronic Accommodation Program ("CAP") at the Department of Defense. (Paper 29, Ex. 3, at 9). Lopez-Nagle provided information on the program and gave her dates that were available for her to go. She agreed to have the assessment and Lopez-Nagle made the appointment. Plaintiff canceled her first appointment (which was to be held June 6, 2007), which Lopez-Nagle had arranged. (*Id.*). Lopez-Nagle then gave Plaintiff the contact information so that she could initiate another appointment.

On May 30, 2007, Lopez-Nagle sent Plaintiff a memo asking again about purchasing an ergonomic chair and requesting more information about Plaintiff's medical condition. (Paper 29, Ex. 3, at 10). The memo informed Plaintiff that the NRC would need additional information to determine if her requests were covered by the Rehabilitation Act of 1973. (*Id.*). Plaintiff never provided any additional information, and she never responded to the offer to order an ergonomic chair. (*Id.*). Plaintiff completed the CAP assessment on June 19, 2007 and Lopez-Nagle thought she "seemed pleased" with the recommended reasonable accommodations. (*Id.*). The CAP manager could not proceed with the accommodations without an additional doctor's note and so he requested one from Plaintiff. She never provided one. (*Id.*). Nonetheless, after the Department of Defense informed Lopez-

4

Nagle that it was out of funding and could not provide the laptop and software to Plaintiff, Lopez-Nagle said that the NRC would pay for it.

On March 22, 2007, the Office of the General Counsel ("OGC") announced a vacancy for a Correspondence Manager. (Paper 29, at 8).  The vacancy announcement stated that the employee would be responsible for managing legal documents and correspondence and included a paragraph on qualification requirements that ended by asserting that "[s]ound knowledge of ADAMS is required."  (Paper 29, at 8).  Mary Tenaglia ("Tenaglia") was the selecting official and interviewed the applicants.  Plaintiff made the "best qualified list" along with five other candidates, and was interviewed by Tenaglia.

In May 2007, Tenaglia selected Kristy Remburg for the OGC position.  Tenaglia noted that the selectee had demonstrated superior knowledge of and familiarity with ADAMS, that she had been with the OGC for two years previously, and that she had a good attitude.  (Paper 29, Ex. 1 ¶ 13-15 and Attach. to Exh.).

On July 23, 2007, Plaintiff filed an EEO Complaint ("July EEO") with the NRC alleging disability discrimination and failure to provide a reasonable accommodation for physical

disability.[4]  (Paper 29, at 14).  She also claimed discrimination and retaliation in connection with her non-selection for the OGC position.

In December 2007, two temporary positions in Commissioner Svinicki's office opened.  On March 19, 2008 Plaintiff expressed her interest in working in the Commissioner's office to James McDermott.  (Paper 29, Ex. 4, at 4).  Lopez-Nagle had no involvement in the selection process for the Commissioner's permanent staff.  Janine Armstrong and Janet Lepre were selected for the position.  (*Id.* at 6).  Jeffrey Sharkey, Commissioner Svinicki's Chief of Staff, was in charge of the selection process.  The positions were filled based solely on the Commissioner's choice, and the administrative assistants serve at the pleasure of the Commissioner.  (*Id.*).

On January 31, 2008, Lopez-Nagle assigned Plaintiff to work in Commissioner Jaczko's office as a floater, but Plaintiff did not report for the assignment.  (Paper 29, at 11; Ex. 4 ¶ 23).  Lopez-Nagle was forced to relocate a qualified secretary to cover, which took until 3:00 p.m.  (Paper 29, at 11; Ex. 4 ¶ 23). On March 26, 2008, Lopez-Nagle issued a written reprimand

---

[4] Plaintiff alleged in her July EEO that she had filed a formal EEO complaint in March 2007 that concerned the denial of her request for an accommodation.  No March EEO complaint is referenced in Plaintiff's complaint, although Plaintiff does reference a February 2007 EEO complaint on the same subject.

to Plaintiff for failing to report to the office assignment. (Paper 29, at 11).

After Commissioner McGaffigan passed away, Plaintiff was assigned to close his office. This assignment lasted from October 2007 to September 2008. (Paper 29, Ex.4 ¶ 24).

On June 5, 2008, Plaintiff left Lopez-Nagle a voicemail indicating that she would not be at work until the afternoon. She had not requested leave in advance as required by NRC policy. (Paper 29, at 11).

On June 6, 2008,[5] Plaintiff had a midyear performance appraisal meeting scheduled with Lopez-Nagle at 1:00 p.m. (Paper 29, Exhibit 15, Letter from Lopez-Nagle to Plaintiff). Plaintiff did not arrive for the meeting, and did not call Lopez-Nagle until forty minutes after the appointment had been scheduled to start. (*Id.*). Lopez-Nagle said they would meet later that day. After several delays, Lopez-Nagle called and asked for Plaintiff to be excused from her work so that she could attend the meeting. Plaintiff came to Lopez-Nagle's office. (Paper 29, at 11). Lopez-Nagle and a team leader in the Human Resources Department, designated by the Deputy Associate Director for Human Resources Operations, were at the

---

[5] Discrepancies exist in the record as to whether Plaintiff's mid-year performance review was scheduled for June 5 or June 6.

meeting.   When she arrived, Plaintiff objected to the presence of the HR person and insisted on calling her attorney.  (*Id.*). When she could not reach her attorney, she would not continue the meeting.  (*Id.*).  She immediately turned her back to Lopez-Nagle and would not allow her to offer any potential alternative meeting times.  (Paper 29, Ex. 15, Letter from Lopez-Nagle to Plaintiff).   Lopez-Nagle then informed her that she could be found insubordinate if she did not attend the meeting, and that "it was just a mid-year."  (Paper 29, Exhibit 4, at 83-84).

Lopez-Nagle later told Plaintiff that she had no right to have an attorney present at the mid-year discussion, and eventually the performance review was completed.   On July 30, 2008, Lopez-Nagle proposed suspending Plaintiff for seven days without pay for inappropriate conduct related to the events of June 5-6, 2008 and the mid-year performance meeting.  (*Id.*).

On May 13, 2008, Plaintiff filed another EEO complaint ("2008 EEO"), which was amended on August 13, 2008 and September 29, 2008 to include additional claims.   All the claims were investigated together.  (Paper 29, at 14; Ex. 4).   In her 2008 EEO, Plaintiff alleged discrimination based on race, retaliation for non-selection of two positions, and hostile work environment.  (*Id.*).

In July 2008, in an effort to alleviate some of the pain associated with her carpal tunnel syndrome, the NRC ordered an

ergonomic chair for Plaintiff, though she had not replied to the 2007 inquiry about the chair.   (Paper 29, at 7).

On August 31, 2008, Plaintiff embarked on the first of several rotational assignments.   Since then, Lopez-Nagle has not supervised her.  (Paper 29, at 7).

On September 15, 2008, following Lopez-Nagle's recommendation, but reducing the length of time to five days, Leonard Carsley, Deputy Associate Director of Human Resources, suspended Plaintiff from September 29-October 3, 2008.  (Paper 29, Ex. 4, at 3).   The suspension was the final addition to her 2008 EEO complaint.

**B.   Procedural History**

After the filing of the July 2007 EEO, in March 2008, Plaintiff requested a hearing with the Equal Employment Opportunity Commission ("EEOC").   From March to August 2008, Plaintiff's attorney and the NRC engaged in a back-and-forth over discovery requests and motions to compel.   On August 13, 2008, an Administrative Law Judge issued an order dismissing with prejudice Plaintiff's request for a hearing.

Plaintiff filed her complaint in the United States District Court for the District of Columbia on October 24, 2008.   On February 5, 2009, Defendant filed a motion for change of venue and the action was transferred to the District of Maryland. (Paper 29, at 16).   The case was transferred to this court on

March 3, 2009.  (Papers 21-22).  Defendant filed a motion for summary judgment on May 13, 2009.  (Paper 29).  Plaintiff responded on August 5, 2009.  (Paper 33).  On September 3, 2009, Defendant filed his reply.  (Paper 36).

Plaintiff has filed a barebones complaint that is less than a model of clarity.  Although in her opening paragraphs she alleges that she has been denied "reasonable accommodations" and that she has "filed a charge of discrimination under the ADA," she does not actually assert a cause of action under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.  She also sets forth several causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981").  Viewing the entirety of the record, Plaintiff has made the following claims: (1) discrimination based on race and sex and manifested by a failure to promote and a five-day suspension; (2) denial of rights under the ADA; (3) hostile work environment; (4) retaliation manifested by a failure to promote and suspension. Defendant has moved to dismiss or for summary judgment all of Plaintiff's claims.

## II.  Standards of Review

### A.  Motion to Dismiss under Rule 12(b)(1)

Motions to dismiss for lack of subject matter jurisdiction are governed by Fed.R.Civ.P. 12(b)(1).  The plaintiff bears the

burden of proving that subject matter jurisdiction properly exists in the federal court. *See Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). In a 12(b)(1) motion, the court "may consider evidence outside the pleadings" to help determine whether it has jurisdiction over the case before it. *Richmond, Fredericksburg & Potomac R.R. Co. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991); *see also Evans*, 166 F.3d at 647. The court should grant the 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond*, 945 F.2d at 768. "[B]ecause of its jurisdictional nature, a court ought to consider the issue of Eleventh Amendment immunity at any time, even *sua sponte*." *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 227 (4th Cir. 1997).

**B.    Summary Judgment Standard**

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(f); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). In other words, if there clearly exists factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*

11

*v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007); *Emmett,* 532 F.3d at 297. A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. *Celotex Corp.*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id*. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 254; *Celotex Corp.*, 477 U.S. at 324. "A mere scintilla of proof, however, will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50. (citations omitted).

C.   **Discrimination Claims under Title VII**

The United States Court of Appeals for the Fourth Circuit ("fourth circuit") has held that then Title VII represents a federal employee's "exclusive remedy for any claim against the United States for intentional discrimination in employment." *Middlebrooks v. Leavitt*, 525 F.3d 341, 349 (4th Cir. 2008), cert. denied by *Middlebrooks v. Leavitt*, 129 S. Ct. 581 (2008)(citing *Brown v. General Services Administration*, 425 U.S. 820, 835, (1976)).

In order to prove subject matter jurisdiction for Title VII claims in federal court, a plaintiff must first exhaust her administrative remedies.   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Section 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16 (1970 ed., Supp. IV), proscribes federal employment discrimination and establishes an administrative and judicial enforcement system. Section 717 (a) provides that all personnel actions affecting federal employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." *Brown*, 425 U.S. at 829.

The fourth circuit has outlined the method for challenging actions by a federal agency.

> A federal employee who believes that his
> employing agency discriminated against him
> in violation of Title VII must file an

13

> administrative complaint with the agency.
> *See* 29 C.F.R. § 1614.106. The agency
> investigates the claim, *see* 29 C.F.R. §
> 1614.108-109, and, if it concludes there was
> no discrimination, it issues a final agency
> decision to that effect, *see* 29 C.F.R. §
> 1614.110. The employee may then appeal the
> agency's decision to the OFO. . . .
>
> [T]he employee has the right to file a
> "civil action" seeking judicial review of
> his discrimination claim if he is
> "aggrieved" by the OFO's decision. *See* 42
> U.S.C.A. § 2000e-16(c) (right of action
> exists if employee "aggrieved"); 29 C.F.R. §
> 1614.407(c). This right of action is
> identical to the right of action possessed
> by a private-sector employee who has
> received a right-to-sue letter.

*Laber v. Harvey*, 438 F.3d 404, 416-417 (4th Cir. 2006).

## III. July EEO Complaint & Retaliation for Filing the Same

In her EEO complaint filed July 27, 2007, Plaintiff
asserted that the NRC had violated the Americans with
Disabilities Act ("ADA") by refusing to provide a reasonable
accommodation for her medically-documented claim. She also
asserted that she was subjected to discrimination based on her
race and age when she was not selected for the position of
Correspondence Manager in the OGC and a white female was.

### A. Reasonable Accommodation

Plaintiff has not included any arguments or causes of
action for a failure to accommodate in either her original or
amended complaint. (Paper 1 and Paper 8). She does, however,
allege that she has been "denied reasonable accommodations for

the carpal tunnel syndrome she has developed" in her original complaint. (Paper 1, at 1). Despite the fact that she has not actually pled any causes under the ADA, Defendant asserts that Plaintiff cannot make such a claim and moves for summary judgment on the issue. In her response in opposition, Plaintiff asserts that she did have a impairment and that Jim McDermott never offered her any reasonable accommodation. She also asserts that Defendant, despite its motion, did regard her as having a disability or it would not have provided her with an accommodation. (Paper 33, at 4). Plaintiff's logic is circular and flawed, and the court will grant summary judgment.

To make out a *prima facie* case under the ADA or Rehabilitation Act, Plaintiff must show that: (1) she is an individual with a disability within the meaning of the statute; (2) Defendant had notice of her disability; (3) with reasonable accommodation she could perform the essential functions of the position sought; and (4) Defendant refused to make such accommodations. *Rhoads v. FDIC*, 257 F.3d 373, 387 (4th Cir. 2001).

Plaintiff does not provide sufficient facts to support her argument that she is an individual with a disability within the meaning of the statute. Both the ADA and the Rehabilitation Act of 1973 define a disability as any "physical or mental impairment that substantially limits one or more of the major

15

life activities of such individual." 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B). Major life activities are those activities of "central importance to most people's lives" and "that the average person in the general population can perform with little or no difficulty." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198 (2002); *see also Hooven-Lewis v. Caldera,* 249 F.3d 259, 269 (4th Cir. 2001).

In the instant action, Plaintiff's alleged disability is carpal tunnel syndrome. While painful and limiting, it is not a disability under the ADA or the Rehabilitation Act. The Supreme Court has required that "when the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491 (1999). In this case, Plaintiff has not shown that she is so severely limited by her carpal tunnel syndrome that she cannot work in a "broad class of jobs." In fact, she applied for several other jobs and rotations at the NRC that would have required typing and participating in many of the activities that carpal tunnel generally prevents one from doing. She also continued to work at the NRC after being diagnosed with her carpal tunnel syndrome. Therefore, Plaintiff does not provide sufficient

16

facts to support her contention that she has a disability under the ADA or Rehabilitation Act.

### B.   Non-Selection for OGC Position based on Discrimination or Retaliation

Because Plaintiff offers no direct evidence of discrimination, her claims must be considered under the burden-shifting scheme outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973).  Plaintiff must first establish a *prima facie* case of discrimination, then the burden shifts to Defendant to provide a legitimate, nondiscriminatory reason for its decision to hire the alternate candidate.  If Defendant satisfies this burden, then Plaintiff must show that the offered reasons are pretextual.  *Id.* at 804.

### 1.  Discrimination Claim

Under the first step of the *McDonnell Douglas* framework, Plaintiff can establish a *prima facie* case of prohibited discrimination by showing that (1) she is a member of a protected class, (2) she suffered an adverse employment action (such as discharge), (3) she was performing her job at a level that met the employer's legitimate expectations at the time of the adverse employment action, and (4) her position remained open or was filled by a similarly qualified applicant outside the protected class. *Baqir v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006).

Plaintiff is an African-American and thus a member of a protected class.  She was also denied the position for which she applied, which could be considered an adverse employment action.  Furthermore, Tenaglia stated in her affidavit that Plaintiff was one of the "best qualified applicants" and so she was interviewed for the position.  (Paper 29, Ex. 1 ¶ 13).  Because Tenaglia hired a woman who was outside of Plaintiff's protected class as well, Plaintiff can show all four required elements to make a *prima facie* case.

Defendant must then rebut the case made by Plaintiff.  Defendant successfully argues that the selectee was simply more qualified for the position, and had one important skill that Plaintiff lacked – expertise in ADAMS.  The fourth circuit has recognized that "relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision."  *Evans v. Technologies Applications and Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).  In addition, in a failure to promote case, "the plaintiff must establish that she was the better qualified candidate for the position sought." *Id. at* 960.  Plaintiff's evidence falls short of that needed because she cannot show that she was more qualified.

The notes of the interviewer are in the record and present clear reasons why Plaintiff was not selected.  In the position description, Tenaglia wrote that, among other attributes, "sound

18

knowledge of ADAMS is required." (Paper 29, Exhibit 2, at 9).
Plaintiff told Tenaglia during her interview that she might need
a refresher on ADAMS, but the selectee had great expertise in
the program. Furthermore, the selected candidate had previously
worked in the OGC and had a better understanding of the office.
Finally, Tenaglia found the quality of the selectee's written
application and performance in the interview superior to
Plaintiff's. (Paper 29, at 34).

There is no evidence of any discriminatory animus in the
non-selection of Plaintiff for the vacant position. "A sincere
belief that a person is not qualified for a job is an adequate
justification for an employment decision and rebuts plaintiff's
*prima facie* case." *Monroe-Lord v. Hytche*, 668 F. Supp. 979, 991
(D.Md. 1987), aff'd 854 F.2d 1317 (4th Cir. 1988). Because no
evidence exists that displays any discriminatory bias,
Defendant's motion will be granted.

### 2.   Retaliation Claim

The *McDonnell Douglas* framework is also applied to claims
of retaliation. *See Laber v. Harvey,* 438 F.3d at 431; *Beall v.
Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997).

To establish a *prima facie* case of retaliation, a plaintiff
must demonstrate that:

> (1) he engaged in protected activity; (2) an
> adverse employment action was taken against
> him; and (3) there was a causal link between

> the protected activity and the adverse
> action. [*See Beall v. Abbott Labs.*, 130 F.3d
> 614, 619 (4th Cir. 1997).] If the plaintiff
> establishes a prima facie case, we then
> apply the remainder of the *McDonnell Douglas*
> test -- whether the employer has produced a
> legitimate, non-discriminatory reason for
> the employee's non-selection and, if so,
> whether the employee can show that the
> reason is false, and, ultimately, that the
> employer retaliated against him.

*Laber,* 438 F.3d at 431.

Plaintiff claimed in the July EEO that she previously had filed an EEO complaint on March 16, 2007. (Paper 29, Exhibit 2 at 8). She claimed in her July EEO complaint that Tenaglia did not select her for the OGC position as retaliation for filing the earlier EEO complaint. Plaintiff does not establish a *prima facie* case, however, because she cannot show that Tenaglia knew of her March EEO complaint, and therefore no causal link exists. Tenaglia avers that she did not know of Plaintiff's EEO activity when she made the selection for the Correspondence Manager position, and Plaintiff has offered no contradictory evidence. (Paper 29, at 35; Report of Investigation 1, at 4). Furthermore, there is no causal connection because the "facts giving rise to the two events do not overlap." (Paper 29, at 35). The agency official whom Plaintiff has accused of denying her a reasonable accommodation, Lopez-Nagle, was not the selecting official for the Correspondence Manager vacancy, and

was not involved in the decision in any way.   (Paper 29, at 35).
Plaintiff's first retaliation claim fails.

## IV.   2008 EEO Complaint

Plaintiff's 2008 EEO Complaint, filed in May of 2008 and
amended in August and September of that year, includes the
remaining causes of action in this case.   These issues involve
(1) whether Plaintiff was discriminated against when she was not
selected for either the temporary or permanent position of
Administrative Assistant for Commissioner Svinicki; (2) whether
Plaintiff was subjected to a hostile work environment due to her
race or previous EEO complaints; and (3) whether she was
discriminated against or retaliated against when she was
suspended for five days in September 2008.   (Paper 29, Exhibit
6, at 1-2).   Defendants have moved to dismiss the race
discrimination and hostile work environment claims and have
moved for summary judgment on the retaliation claims.

### A.   Subject Matter Jurisdiction under Title VII

Defendant contends that the court lacks subject matter
jurisdiction over Plaintiff's Title VII race discrimination and
hostile work environment claims brought in her 2008 EEO, and
that these claims should be dismissed.   (Paper 29, at 37 and
42).   In particular, Defendant claims that Plaintiff filed her
second EEO complaint on May 13, 2008 and filed this judicial
complaint on October 24, 2008, fewer than 180 days later.

Defendant argues that the statute is clear that 180 days must pass from filing of an administrative complaint before filing a civil action for those claims.  (Paper 29, at 37-38).

Federal employees who seek to enforce their rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, must exhaust their available administrative remedies prior to pursuing an action in federal court.  *Brown*, 425 U.S. at 832. This requirement exists to minimize "judicial interference with the operation of the federal government."  *Doe v. Oberweis Dairy*, 456 F.3d 704, 712 (7th Cir. 2006)(internal quotations omitted). It also affords an "agency the opportunity to right any wrong it may have committed."  *McRae v. Librarian of Congress*, 843 F.2d 1494, 1496 (D.C. Cir. 1988).

In the instant case, Plaintiff filed her original 2008 EEO complaint on May 13, 2008.  She added complaints of hostile work environment on August 13, 2008 and September 29, 2008.  Before 180 days had passed, on October 24, 2008, she filed her complaint in federal court.  Because no final action had yet been taken on this EEO complaint by the NRC, 90 days had not passed since receipt of notice of final action.  The report of investigation issued was not even completed until October 30, 2008, and was not delivered to the NRC until November 3, 2008. (Paper 29, Ex. 4).

As noted above, in *Laber v. Harvey* the fourth circuit summarized the process by which a federal employee may seek relief. *See Laber*, 438 F.3d at 416. After an employee files a complaint with her agency, she must either await a final decision from the agency or wait 180 days if no final decision has been forthcoming, before she can file in federal court. The applicable statutory section outlining the requirements to file in federal court reads in part:

> Within **90 days of receipt of notice of final action** taken by a department, agency, or unit . . . on a complaint of discrimination . . . **or after one hundred and eighty days from the filing** of the initial charge with the department, agency . . . until such time as final action may be taken by a department. . . an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, . . . may file a civil action. . . .

42 U.S.C. § 2000e-16(c)(emphasis added). In this case, because Plaintiff filed her suit before 180 days had passed, it is clear that she had not exhausted her administrative remedies as to her Title VII claims. *See Barrera v. Getty*, 2009 WL 2499381 (D.Md. 2009); *see also Laber*, 438 F.3d at 415 (Holding that all employees, private-sector or federal, alleging discrimination must exhaust their administrative remedies before exercising their rights in federal court under Title VII.). Because Plaintiff had not exhausted her administrative remedies for the

discrimination and hostile work environment claims in her 2008 EEO, these claims must be dismissed.

**B.   Retaliation Claims**

The final retaliation claims, added by Plaintiff in her amended complaint, allege that the NRC acted illegally when it (1) did not select her for the temporary or permanent position in the Commissioner's office; and (2) suspended her for five days. (Paper 8). Plaintiff fails to make a *prima facie* case of retaliation for the first claims, and her case is successfully rebutted by Defendant for the second.[6]

Although Plaintiff did engage in a protected activity when she filed her EEO complaints, and may have suffered an adverse employment action when she was not selected for several positions, she cannot prove a "causal nexus" between the two required for a *prima facie* case of retaliation. *Orenge v. Veneman*, 218 F.Supp.2d 758, 763 (D.Md. 2002). The nexus is lacking because she did not submit an actual application for the

---

[6] Plaintiff alleges in her complaint that the manual used by the NRC is unlawful because it is not published in the Federal Register. The NRC was under no obligation to publish it according to the statute, because it is a manual used by the NRC to set agency procedures. (See *Minotti v. Whitehead*, 584 F. Supp. 2d 750, 762 (D.Md. 2008), noting that "[t]he APA's . . . requirements only apply to legislative (i.e. substantive) rules and do not apply to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'" 5 U.S.C. § 553(b)(A).

temporary position, and, for the permanent position, the person in charge of selection did not know of her EEO complaints.  The facts surrounding the hiring of employees for the new temporary and permanent position in the new Commissioner's office are recounted above.

Plaintiff could not have applied for the position of a temporary position because, according to Jim McDermott, no applications were accepted.  Rather, several supervisors had an informal discussion and chose several secretaries to rotate and work for the new Commissioner temporarily.

As reported above, the person in charge of deciding whom to appoint for the permanent positions in the Commissioner's office, Jeff Sharkey, did not know of Plaintiff's EEO activity. Because of this lack of knowledge, Plaintiff cannot make out a causal connection between her EEO activity and her non-selection for this position.

Plaintiff can show a *prima facie* case of retaliation regarding her five-day suspension, because a causal nexus may exist between the filing of her EEO complaints and her suspension.  Defendant successfully rebuts Plaintiff's case, however, by offering a legitimate, non-discriminatory reason for the suspension.

The NRC follows a practice of progressive discipline, according to Defendant.  The first warning that an employee

receives is a written warning.   After this warning, if another incident occurs, supervisors may decide to suspend the employee. In early January of 2008, Lopez-Nagle had given Plaintiff a written warning.   Several months later, on July 30, 2008 Lopez-Nagle issued Plaintiff a proposed suspension based on three factors:

> (1) [Plaintiff] did not appropriately request leave for an appointment in advance, and did not inform Lopez-Nagle of extenuating circumstances that prevented her from giving advance notice; (2) [Plaintiff's] failure to attend the June 5, 2008 mid-year review as scheduled; and (3) when [Plaintiff] arrived for her mid-year review she would not meet with Ms. Lopez-Nagle without her attorney being present.

(Paper 29, Exhibit 4, Report page 14).   Lopez-Nagle was not ultimately responsible for the decision to suspend Plaintiff. That responsibility fell to Leonard Carsley.   He reviewed the proposed suspension from Lopez-Nagle and gave Plaintiff an opportunity to respond, which she did.   (*Id.*)   He then mitigated the suspension based on discrepancies in the dates of the incidents.   He also gave Plaintiff an alternative to the suspension, which she chose not to take.[7]   Although Plaintiff may feel that the punishment was unwarranted, there is no evidence

---

[7] The alternative would have "resulted in the discipline not going into her personnel file although the record would be held by the labor relations but not be accessible to other managers." (Paper 29, Ex. 4, Report of Investigation at 14).

that it was retaliatory.   Defendant has offered sufficient evidence of legitimate, non-discriminatory and non-retaliatory reasons.   Defendant's motion for summary judgment on these retaliation claims will be granted.

## V.   Conclusion

For the foregoing reasons, Defendant's motion to dismiss those claims brought under the 2008 EEO will be granted, and Defendant's motion for summary judgment on the remaining claims will be granted.   A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
